Second case on the calendar, Barbera v. United States of America, 2365-72 and 2372-55. We'll give everybody time to settle at the table. Let's just wait for the doors to close. If you don't let the doors close, one of my cats may escape. That would be contempt of court. All right, Mr. Shapiro, I understand you'd like to reserve two minutes for rebuttal. Is that right? I would, Your Honor. Thank you. You may proceed. May it please the Court. I'm Alexander Shapiro with the firm of Ford O'Brien Landy. I represent Defendant Appellant in this appeal from a criminal conviction and sentencing in the Southern District of New York. The government prosecuted this case, and the district court sentenced the defendant as if this were a Ponzi scheme, but it was not. The evidence established, and the government does not contest on appeal, that NanoBeak Biotech was a real company with valuable assets, a legitimate board of directors that exercised meaningful control over the company, and compelling commercial prospects. In the words of the government's own witness, the chairman of the board and successor CEO who took over the company after Mr. Barbera was dismissed, the financial prospects of the company were somewhat— I'm sorry, are you arguing the insufficiency of the evidence as to fraud? Your Honor, I thought you were just making a legal argument that the government relied on, and the court instructed the jury on what was effectively a Simonelli theory, but are you arguing the facts? I don't understand that the Ponzi scheme—what does that have to do with anything? Because, Your Honor, what the assumption is of our legal theory is that the investors in NanoBeak were shareholders, were stockholders, which means that any harm, any theft from the company accounts was only a harm to the company, not to the investors. So you're saying that inherently what your client did cannot be conceived of as a theft of property or defrauding somebody of property? It must be conceived of as a theft of someone's right to control their property. Is that what you're saying? That's the only way to conceive and try this case? The argument is that the misrepresentation— Because that's not what the judge told the jury, right? The judge instructed the jury on the standard scheme to defraud language, and what we're arguing is that the theft of company monies could not by definition be a harm to the investors, which is what the government argued, and that is by virtue of the fact that the company was real and the investors had real shares in the company. They were stockholders. So they had rights as stockholders under Delaware law. So just tell me what analytical box you're challenging the conviction under, because I thought you were saying the convictions have to be reversed under similarity. Correct. But I thought that your point was in that that the jury was misled into thinking that this was not a defrauding of property case. The jury— Or am I misunderstanding? You're saying that the jury understood perfectly well that it was told that it was a defrauding of property case, but there's no way they could have reached that decision, which is an insufficiency argument. Correct, but it's also that the legal theory was invalid because the— How is that a legal theory and not a factual theory? If you say to me, you stole my dog, therefore you're guilty of murder, that's not a legal theory problem. That's an insufficiency problem, right? And if the jury was instructed, you have to find somebody who got killed, right? And the evidence shows that no, all you did is steal somebody's dog. We wouldn't say, oh, we have a legal theory problem. We would say there's an insufficiency problem. There's no evidence that anybody got killed. So that's why I'm trying to figure out. I thought you were making, from the brief, more of a legal theory argument. But that bases—that has to be based on instructing the jury the wrong way. But if the jury was instructed the right way, that it was a regular scheme to defraud for property, then you have to show that it was insufficient evidence that there was any property taken. And now we've got investors who don't have their money. Right. It's kind of like a murder, and you've got a dead body. So there's no problem on the sufficiency end. It's an insufficiency argument, but it's also insufficient insofar as they could not argue a fraud on the investors under the facts as alleged, so that there's a legal component of that, which is— No, there's not. It's a factual component. It's factual insufficiency. You're just saying it didn't happen. It didn't happen. But the government relied on the representations to the investors as fraud on the investors and to the extent that— Did the investors have their money anymore? Didn't they argue that the investors don't have their money anymore? They did as a consequential— So how is that not a theft or defrauding of property? Because— Correct, Your Honor. Isn't that a fraud? Well, not in this instance because the investors got the benefit of the bargain. They got shares in the company, which is what they were being sold. And our argument is insofar as they got the benefit of the bargain, which is the shares in the company, and the government never argued that somehow the shares were invalid or they didn't get their shares or that the company was invalid. So tell me why your theory would not give green light to any fraudster to get out from under a 1341 or a 1343 fraud prosecution by always passing the defrauded proceeds through the mechanism of investment in a sham company and say, oh, I didn't steal it from you. I stole it from the company. But that's the— Why not? That's the factual predicate that we're contesting here, Your Honor, that it wasn't a sham— A fraudster can always escape fraud liability by stealing from the company and not the investors, and you have to charge it as defrauding the company? Well, Your Honor, when you— Why is that not—why are you not effectively creating an escape hatch for every fraudster to always structure their fraud in that way? Because the government argued this as a Ponzi scheme. I see my time is up. May I answer the question? No, we've got time. The government argued this as if this were a Ponzi scheme. If this were a Ponzi scheme— Yeah, by the way, that's only two minutes. Yellow means you're still good to go. Okay. But even when it's red, we're going to keep both of you up. The government argued this as if this were a Ponzi scheme, that this was a sham company. It wasn't a sham company. Once you accept that premise and you understand that the shareholders receive shares, they gain rights as Delaware stockholders, and indeed, as Delaware stockholders, they may have had claims for waste and mismanagement, but those would be derivative claims, and any recovery in a claim such as that would have gone to the company, not to the investors. That's our argument, which is if we respect the corporate form here, and that's what we're— Why do you have to respect the corporate form? The question is did you trick people into giving away their money, and if they don't have their money anymore, that's what you took away from them? And I thought that was the point of Simonelli, is that the thing you can't take away from someone is their intangible right to control stuff. That's not a thing. You've got to steal a thing from them, and if you steal a thing, whether it's their car or their money or whatever, we've got a valid fraud claim. I thought that was really all Simonelli was. But, Your Honor, the point that we're trying to make is— And they split legs that they took money from people. The people don't have their money anymore. Correct, Your Honor. That is the theory that the government advanced, but our argument is that there was an intervening step here of shares. Shares were exchanged. This is a benefit of the bargain argument that arises under STAR, arises under region supply, which are fundamental precedents of this circuit, which is in those cases the customers gave money to the service providers. So you're saying that if I am a fraudster and I want to steal all of your money, Mr. Shapiro, and I say, give me all your money and I'll give you the Brooklyn Bridge, you're saying, yep, that's fine, that's a fraud, no problem, because there's no Brooklyn Bridge for you to buy. But if I create a company and I say, I have a company that's about to buy the Brooklyn Bridge, give me a million dollars, you'll get shares in this company. Don't worry, we're going to buy the Brooklyn Bridge. You give me the million dollars, I give you shares worth that in my company. I never buy the Brooklyn Bridge, never had any intent or ability to buy the Brooklyn Bridge. I just walk away with your money and I go off to the Bahamas. You're saying now that person cannot be prosecuted for fraud? They would, Your Honor, and they could, Your Honor, because that would be an invalid company. Why is it an invalid company? I incorporated it, I created stock, shares, it's all created, but I just lied about the purpose for which I was going to use the company. I just made off with the money. I embezzled it from the company. The company is just an inert form. It doesn't have an evil purpose or a good purpose. It's just a corporate entity. But the government built its case on the credibility of witnesses who were board directors who testified to the validity of the corporate enterprise. Okay, so now let's twist my hypothetical. I buy a small company, I buy dry cleaners, real dry cleaners, and I make it into a company and I say give me a million dollars, and through the dry cleaners we're going to buy the Brooklyn Bridge, and I take your million and I run off. But it's a real dry cleaners. It's a small business, but it's a real dry cleaners. There's a guy there in dry suits. Now you're saying that that's on all fours with your case because it's a real company. I haven't defrauded the investors. What happens in that case? The misrepresentation to the investors was not the claim here. The claim here was that the misrepresentations were means to the end to take money out of the company accounts. And we're arguing that those are two separate elements here, and the government's trying to merge them. And what we're saying is that there's an intervening entity, which is the company, which was run by legitimate people who ultimately fired Mr. Barbera when they found that he had misappropriated company funds. So in my dry cleaner example, how does that play out? So the dry cleaner example, if it is a legitimate dry cleaner. It is, in my hypothetical. And there's a guy there who's been running it for 35 years. Then the taking of monies from the company account is just that, taking monies from the company account but not taking monies from the investors. So in my hypothetical, the investors were not defrauded. The dry cleaner was defrauded. That's your argument. And I get it. That's logically consistent. But it does seem to point out what I would suggest is the absurdity of the proposition. But it's not absurd, Your Honor, because the company accounts, the misrepresentations to the investors were means, under the government's theory, were means to an end, yes. But those were deprivations of economic information. The deprivation here was the taking of money out of the company account. The company was a valid, legitimate entity. And the shareholders acquired rights upon becoming shareholders. They got the stock that they paid for. So the argument is that this is a benefit of the bargain argument. Just as in Starr, just as in region supply, there was exchange of money, and the customers got the benefit of the bargain. Indeed, in Starr, there was misappropriation of the company, of the customer monies, and they were given false statements as to how the money had been processed, what the price was. So there were misrepresentations about the handling of the money. And yet, in that case, the circuit court found that a valid bargain had been struck. The government's never argued that the shares were invalid, that there was some price manipulation here, such that the investors were not getting what they paid for, which was shares in NanoBig. The representations about what he was going to do with the money were incidental to the fraud that the government alleged, which was the taking of the company monies. But those, there was an indirect, and this is Goville, there was an indirect relationship between taking money from the company coffers and the impact that it has on the investors. In the sentencing context, the judge needed to analyze that share impact. It declined to do so. But that's the analysis in the sentencing context that the judge must have taken here. There is no direct correlation between taking money from the company and impact on the shareholder's value. And indeed, the evidence that was presented to the sentencing judge was that there was no change, according to the board, in the share value, even after the fraud was detected. So why don't I just pause here. Let me just see. I've kept you up for some time extra. Let me just see if my colleagues have any questions they'd like to ask. No? Judge Sack? No.  Why don't we hear from you. You've reserved a couple of minutes for rebuttal. Thank you, Your Honor. I look forward to seeing you again shortly. But in the meantime, why don't we hear from the governor? Good morning, Your Honor, and may it please the court. My name's Ryan Neese. I'm an assistant United States attorney in the Southern District of New York, and I represent the government on this appeal. The core problem with the defendant's primary argument on appeal is that Mr. Barbera attempts to entirely reframe the government's theory, the traditional property fraud on investors, as what he calls a secondary corporate embezzlement. But that simply wasn't the government's theory. The government didn't argue it. The jury wasn't instructed on it. And because this court presumes that juries follow the instructions that they actually are given, the only question for this court on appeal is sufficiency of the evidence, which is here on plain error review. This court has held as much in three summary orders already. That's in the government's 28-J letter. Tuzman, Andrew Pasternak. Let me just ask you, how do we layer plain error review on top of sufficiency review? So with sufficiency review, we already asked Jackson v. Virginia whether any rational jury could have returned a guilty verdict. Under plain error, we usually say, well, is it plain? And it usually has an additional degree of leeway for the error. So are we saying by layering plain error on top that even a slightly irrational jury could have returned a guilty verdict? Is there really any change in the standard of review when we layer plain error on top? I mean, are we really saying that even moderately irrational juries could return guilty verdicts and we're fine with it? What does that mean? I think formally speaking, Your Honor, plain error does layer on top because plain error accounts simply for the fact that the objection was not made below. No, I know that, but what I'm saying is a practical matter. Once we layer it on top, what more is there to do? I would also add the plain error has a fourth part to it, part four, which is is this somehow devastating to the whole world? I mean, it's a very strange thing that I don't think we ever rarely do we focus on it. But plain error, if taken literally the way it has been spelled out by the courts, we virtually never find it because it's so difficult to scale. I agree with that, Your Honor. I think that in practice, Judge Nardini, the difference is likely to be minimal. I think that arises primarily, though, because in the Rule 33 context on sufficiency of the evidence review, the standard is already so exceedingly deferential to the jury's verdict that plain error review on top of it probably- Rule 33 or 29? I think 29 for- Well, as to the defendant's Simonelli claim, the argument was both Rule 29 and Rule 33 in the alternative. But on the sufficiency of the evidence argument, this Court would only disrupt a jury's verdict if no rational jury could find as it did. That is an exceedingly deferential standard, this Court says, exercised in only the most extraordinary circumstances. Here, there can be little doubt that there was not sufficient evidence for the jury's verdict. Only a lawyer could say that clear error and plain error are completely different things. But I guess we say that all the time, don't we? We do, Your Honor. I think, as Judge Codal observed, the evidence of the defendant's guilt here was, quote, overwhelming. A fraud on investors to obtain their money is in the heartland of a traditional property interest. Did you argue that the company or the investors were the victims who lost their money? The government's theory here was plain, which is that the investors were the victims, that the object of the scheme was to deprive investors of money. That is a traditional property interest that clearly satisfies Simonelli. And lying to them so that they were deceived, in some way altering the information in their brain, which led them to control their money in a different way, I take it that unlike in the Simonelli line, or the old line of cases we had pre-Simonelli, maybe the government could have alleged that it was, that was the thing stolen from the investors, was their ability to control money. But here, I understand, that's basically the modality of the fraud, which is the modality of the fraud in nearly every case, which is tricking someone by deceiving them as to the truth, so that they will control their money in a particular way, in a way that they don't have their money anymore, but it's here you allege that the money is the thing that they were deprived of, not the knowledge that they were deprived of, or the control that they were deprived of. Am I accurately characterizing the government's theory? That's entirely correct, Your Honor. I think it's right that theoretically, even the hypothetical that you raised, could also not run afoul of Simonelli, but that's just not the case here. Here, it was a very simple, very traditional theory, which is that the defendant made misrepresentations in exchange for investors' money. And the district court found, or concluded, when it evaluated this claim, that misrepresentations were rife throughout the record. The defendant lied about his credentials. He said he was a physicist and a rocket scientist. That was not true. He said he had graduated from MIT. That was not true. That he worked for NASA for more than 10 years. That was not true. He lied about the technology, that the company even had a working prototype, let alone one that could detect breast signatures in order to detect lung cancer. That was not true. He lied about the company's business prospects, projecting that the company was on track to make tens of millions of revenue in only a year or two years hence, when, in fact, there was not even a working product. He lied about the use of funds, that the funds would be used for ordinary business purposes and research and development. Instead, almost half of the investor funds he simply looted for his own personal purposes in order to pay for, for example, a Central Park West apartment and private school tuition and jewelry. All of those misrepresentations, the district court found, and this court should find, were sufficient for the jury to reasonably conclude that the defendant lied in order to obtain investors' money. That is a traditional, classic, heartland wire fraud theory, and Simonelli has simply nothing to say about it. Moving on to the appellant's argument as to loss calculation, here the district court adopted a reasonable estimate of the loss, which the district court found was the same in the intended loss as it was in the, the intended loss was the same as the actual loss. That is a reasonable determination that was made on an abusive discretion standard. The district court explained at length why he was adopting the methodology he did, and there was no clear error in adopting the loss amount that he did. Unless the panel has any other further questions, the government would rest on its brief. Thank you very much. Why don't we hear from Attorney Shapiro. You've reserved two minutes for rebuttal. If there's anything you'd like to add. Thank you, Your Honor. So our point, again, is that in the framework of a scheme to defraud, lies to investors is a mere deprivation of economic information. The government was alleging a fraud on the company, but they did not argue that to the jury here. They argued it was a fraud on the investors. That's the distinction that we're trying to draw between the two prongs of this. The other issue is that on sentencing, the court was required to analyze this from the shareholder's share value, and instead they assumed that the loss was just the total amount invested. That was wrong under Goville, because Goville says that there's no per se harm from a mere looting of the corporation. There has to be some analysis of the share value. That's a loss causation analysis that the district court completely failed to undertake, and the government completely failed to support. The Ebers and Rutkowski cases are the guidelines for a share investor fraud analysis on the sentencing level. And again, the judge just assumed that the fraud and inducement was the crime here, and that the amount that had been acquired by the defendant as investment was the harm. And that's not the pecuniary harm that he should have been analyzing. In fact, it had to be based on a much more specific share valuation analysis, again, which the government never presented. We argued this below, and the district court passed over that entire issue and did not even address whether that was even relevant. The other determination was that there was evidence before the district court at sentencing was that the board of directors had basically wiped the slate clean with respect to the withdrawal of funds from the company accounts by granting, retrospectively, the defendant his salary to the amount of $2.1 million. Well, that's all well and good for the company to decide that, but the investors are still out to have money, right? Right, but at the end of the day, the investors, when they buy shares in a company, are dependent on the company and the board of directors to govern that company consistent with the rules of corporate governance. That's the argument here, that this was a company that had a legitimate board, that had oversight. And in fact, the way the government presented this case was basically a corporate governance success story because the board did what it was supposed to do, which was dismiss the CEO and take over the company thereafter. And the company continued for another two years. So there was a large proximate cause gap that the district court never analyzed. Okay. I think we have your argument, unless, Judge Sack, any further questions? Thank you, Your Honor. Okay. Thank you both very much.  Very helpful arguments. We will take the case under advisement.